UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE: ) | Chapter 11 |
| ) | |
| **FAMOUS RECIPE COMPANY OPERATIONS,** ) | **Case No. 10-94027 -** MHM |
| **LLC, d/b/a Mrs. Winner's Chicken & Biscuits,** ) | |
| ) | |
| Debtor. ) | |

**MOTION OF DEBTOR FOR ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS**

COMES NOW Famous Recipe Company Operations, LLC, d/b/a Mrs. Winner's Chicken & Biscuits, debtor and debtor in possession herein ("***Debtor***") and files this Motion seeking approval of a sale of substantially all of Debtor's assets (the "***Motion***").

### I.   Preliminary Statement

1.   Debtor operates fourteen[1] "Mrs. Winner's" brand quick-service chicken restaurants.  In connection with these operations, Debtor owns various equipment, inventory, other personal property, store leases, and contract rights.  Debtor has also used and controlled the Mrs. Winner's brand name since Debtor was formed—although these trademarks and related intellectual property are registered in the name of Winners International Restaurant Franchise Services, Inc. ("***Winners***").  Winners is not a debtor, but shares the same parent corporation with Debtor.  Other third parties also operate

---

[1]   One store location will be closed by July 15, 2011, with the associated fixtures returned to the landlord, pursuant to prior order of this Court.  Accordingly, only thirteen locations are for sale.

- 1 -

separate Mrs. Winner's stores pursuant to arrangements with Winners, although Debtor and Winners have at different times supported or supervised those third-party operated stores.

2. Since the filing of this case, Debtor's management and professionals have attempted to work cooperatively with the Official Committee of Unsecured Creditors (the "*Committee*") and with Winners and other affiliates to determine the best way to maximize the value for Debtor's assets. Pre-petition, Debtor's control parties operated Debtor for a substantial period of time without having Debtor pay withholding, sales, and other trust fund taxes. This has led to an insurmountable level of liabilities that preclude any reorganization. In addition, Debtor has no access to capital, and operations have been only break-even or at a slight loss, and so available cash has decreased. As such, for the past several months, Debtor and the Committee have jointly pursued a sale process, which Winners has supported, subject to on-going negotiations over what Winners would receive from this sale.

3. Debtor retained, by a prior order of this Court (Doc. No. 137), Arlington Capital Advisors, LLC ("*Arlington Capital*"), to assist in this sale process. Arlington contacted in excess of 200 potential buyers, of which over 25 have signed confidentiality agreements and received Arlington's "information memo" and other due diligence. However, the degradation of Debtor's restaurants due to their long-term lack of capital, plus Debtor's declining revenues, plus the lack of any investment in the Winners brand

name over the years, has resulted in very low preliminary bids, and no stalking horse buyer.

4. Debtor and Arlington have previously alerted potential buyers that an open auction (the "*Auction*") shall be held on July 12, 2012, pursuant to the auction procedures attached as Exhibit A. Debtor shall convene the Auction and then proceed to this Court to approve the sale to the highest and/or best bidder.

5. As part of this sale process, Debtor also seeks to convey to a buyer all trademarks, brand names, logos, trade names, menus, recipes, trade secrets, and associated good will (the "*IP Assets*"). As noted above, Winners purports to own the IP Assets and has filed trademark registrations for the IP Assets. And in good faith, the Committee and Debtor negotiated with Winners for the past several months to come to an agreed allocation of any sale proceeds, whereby a percentage of proceeds would be allocated to the Non-IP Assets and remain in this Estate, while the balance would be allocated to the IP Assets and paid to Winners. This would allow a consensual sale to go forward and avoid any litigation as to Debtor's rights to convey the IP Assets. Those negotiations came close to an agreement in principal, but the initial bids received were not sufficient to allow any meaningful recovery by Winners. A few weeks ago, Winners indicated its desire to pull out of the sale process. And since that time, another affiliated company has filed its own Chapter 11. *See In re Lee's Famous Recipes, Inc.*, Case No. 11-68463-MHM. Debtor and the Committee still speak with Winners, and hopefully

those negotiations will continue regarding a settlement amount for the sale of the IP Assets, but by this Motion, Debtor seeks to sell the IP Assets as part of its operations. As set forth below, Debtor has substantial claims that its interest in the IP Assets is superior to that of Winners.

## II.    Background

6. On November 10, 2010 (the "***Petition Date***"), Debtor filed a voluntary petition for relief, thereby initiating the above-captioned bankruptcy proceeding (the "***Bankruptcy Case***"). Debtor acts as debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

7. The Committee was appointed on November 23, 2010.

8. Prior to the Petition Date, Debtor was an integrated part of a larger operation, under the umbrella of an entity known as Lee's Holding Company, Inc. Debtor operated some 92 Mrs. Winner's locations, and there were as many of 21 third-party operated stores. Debtor had lost money for some time, though, and by late 2010, lacked any ability to fund operations, after having used trust fund taxes for other obligations under the guide of Debtor's former control parties. Thus, prior to the Petition Date, Debtor closed or sold the vast majority of its locations, leaving it with 14 restaurants that, with short term lease concessions, could possibly survive. However, the overhang of liabilities required Debtor to still file for bankruptcy.

9. Since the Petition Date, Debtor has operated its restaurant locations and continued to use the IP Assets in its discretion, without objection by Winners and without payment of any license fee or other amount to Winners, which is consistent with past practice among these affiliated parties.

### III. The Proposed Auction Process

10. The Bidding and Auction Procedures are attached as *Exhibit A*, and are customary for sales of this type. If Debtor receives any bids, there shall be an Auction, and as soon as practicable after the Auction, Debtor shall file the final asset purchase agreement with this Court.

11. In addition, it is unknown which store locations a purchaser will acquire. Accordingly, once that is known, Debtor will file a separate motion with this Court seeking to assume and assign any associated leases or contracts, and seeking the consent of the applicable landlords of non-residential real property leases. The counterparties to such leases or contracts will receive a separate notice at that time, an opportunity to understand the buyer's ability to perform and pay any cure amounts, and shall have a separate opportunity to object or consent. Thus, by this Motion, Debtor is **not** seeking to assume or assign any contracts or leases.

### IV. Relief Requested and the Basis Therefor

#### a. Approval of Bidding and Auction Procedures

12. Movant respectfully request the Court to approve the procedures attached as *Exhibit A*. The Bidding and Auction Procedures are designed to give Movant flexibility while providing bidders with transparency and fair bidding guidelines. Movant submit that these Bidding and Auction Procedures are reasonable, conducive to a transparent Auction, designed to maximize the value of Debtor's estate, and sufficiently flexible. Accordingly, Movant respectfully requests the Court's approval of the Bidding and Auction Procedures.

#### b. Approval of Sale Free and Clear of Liens, Claims, Encumbrances, and Interests

13. Section 363(b) of the Bankruptcy Code permits Debtor to sell or use property of the bankruptcy estate outside of the ordinary course of business after notice and hearing. 11 U.S.C. § 363(b). Courts apply the "business judgment test" to proposals to Sell or use estate property under § 363(b). *See, e.g., In re Allied Holdings, Inc.*, 337 B.R. 716, 772 (Bankr. N.D. Ga. 2005) (applying business judgment test to proposed non-ordinary use of estate funds); *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 512 (Bankr. N.D. Ala. 2002) (applying business judgment test to proposed non-ordinary sale of estate property).

> Under this standard, the [debtor-in-possession] has the burden to establish sound business reasons for the terms of the proposed sale [or use]. Factors for the Court to consider in whether to approve the sale [or use] include: (1) any improper or bad faith motive, (2) price is fair and the negotiations or

>bidding occurred at arm's length, (3) adequate procedure, including proper exposure to the market and accurate and reasonable notice to all parties in interest. The [debtor-in-possession] is responsible for the administration of the estate and his or her judgment on the sale and the procedure for the sale is entitled to respect and deference from the Court, so long as the burden of giving sound business reasons is met.

*Gulf States Steel*, 285 B.R. at 512 (following *In re Bakalis,* 220 B.R. 525, 531-32 (Bankr. E.D.N.Y. 1998)).

14. This sale will be within Debtor's sound business judgment. It is motivated by a desire to maximize the value of Debtor's estate while minimizing further harms that creditors and the estate will suffer if Debtor ceases operating as a going concern. Debtor's ability to reorganize with a sale is highly questionable, given the estimated large tax claims against Debtor. The price that will be produced by the Auction will be fair because that price will be produced by competitive bidding, after substantial exposure of the assets and the opportunity to buy them by Arlington to a bevy of interested parties. Finally, the procedures for the Auction are fair and appropriate—Arlington is an experienced and capable investment banker, and will ensure adequate marketing of the assets.

15. The sale of these assets free and clear of all liens, claims, encumbrances, and interests is also appropriate under § 363(f) of the Bankruptcy Code because Debtor has no secured creditors.[2] Further, all creditors will be given notice of the sale and the opportunity to object, and their failure to object and assert any security interests in these

---

[2] In addition, upon information and belief, there are no liens on the IP Assets.

- 7 -

assets should be considered consent to such sale free and clear of any such interests under § 363(f)(2) of the Bankruptcy Code. *See, e.g., FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281 (7th Cir. 2002), *cert. denied*, 538 U.S. 962 (2003) (finding that failure to object may constitute consent, if there was adequate notice). Finally, Movant believes any heretofore unknown and unasserted security interest will subject to *bona fide* dispute, which would provide further authority for the sale of the assets free and clear of such interests under § 363(f)(4) of the Bankruptcy Code.

### b. Approval of the Sale of the IP Assets By Debtor

16. As noted above, Debtor seeks to also sell the IP Assets. Winners has, since this case was filed and before, claimed an ownership interest in those IP Assets. Indeed, it appears that Winners was originally established in order to segregate the IP Assets from the interests of Debtor and from the creditors of Debtor. As also noted above, Winners also registered the various trademarks associated with this business in its name.

17. By the same token, there appears to never have been any formal license agreement in place between Debtor and Winners. Debtor appears never to have paid any license fees for use of the IP Assets. Debtor operated independently of Winners - Winners did not own Debtor or control Debtor or direct how it operated with the IP Assets. Rather the parties were merely under common control, with no documentation by which Debtor was restricted in its use of the IP Assets.

18. In addition, since before the Petition Date and since the Petition Date, Winners has exercised no control over how Debtor operates its stores. Debtor has

independent operating management, which prepared new designs, labels, trade-dress, and the like, all in expectation of a recapitalization or sale.  Since before the Petition Date and after, Debtor also provided all or substantially all of the support and relationships with the licensed/franchised stores as well.  Indeed, early in this case, Winners recognized that, and stated that to the extent it collected any license or royalties from such locations, it would remit them to Debtor.  (Winners later changed its mind and kept the money.)

19.   On these facts, it is unclear exactly what interest Winners holds in the IP Assets.  At a minimum, Winners is estopped from preventing Debtor to use, and thus transfer, the rights to the IP Assets.  As held by the Fifth Circuit:

> The owner of a trademark has not only a right to license the use of his trademark to others, but also a concurrent duty to exercise control and supervision over the licensee's use of the mark. *Denison Mattress Factory v. Spring-Air Co.*, 5 Cir. 1962, 308 F.2d 403, 409; *Cf. Kidd v. Johnson*, 1879, 100 U.S. 617, 25 L. Ed. 769.  Failure to exercise such control and supervision for a significant period of time may estop the trademark owner from challenging the use of the mark and business which the licensee has developed during the period of such unsupervised use. *Denison Mattress Factory v. Spring-Air Co.*, supra. This principle is an analogue to the estoppel against a trademark owner who knowingly sits silently by while infringers use his trademark over a significant period of time. *Saxlehner v. Eisner & Mendelson Co.*, 1900, 179 U.S. 19, 21 S. Ct. 7, 45 L. Ed. 60; *Dwinell-Wright Co. v. White House Milk Co.*, 2 Cir. 1943, 132 F.2d 822. The undisputed failure by the McCaffertys to exercise any supervision or control over the activities of Pan American or its successor SS Florida leads us to hold that SS California is estopped to challenge the business which SS Florida has built up under the mark Sheila Shine. As we develop, infra, however, this estoppel precludes challenge only in the trade area awarded to SS Florida.

*Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 123-24 (5th Cir. 1973). In that case, the Fifth Circuit further held that "[t]he actual cessation of an established business plus an intent to abandon it is sufficient to constitute abandonment and concomitant loss of rights in a trademark." *Id.* at 124. The evidence will show that clearly before the Petition Date, Winners (and indeed, all affiliates of Debtor) abandoned these operations, allowing them to continue to operate with no ability to pay obligations, and without even an ability to turn over trust fund taxes collected. *See also Miller v. Glenn Miller Productions*, 318 F.Supp. 2d 923, 945, fn. 12 (C.D. Cal. 2004) ("a licensor's failure to supervise and control a particular license may estop him from challenging a particular licensee's use of the mark.") (citations omitted). The focus of Winners, and its affiliates, has for some time been on the Lee's operations, which until recently were outside of bankruptcy and had a hope of long-term profitability. Debtor was abandoned, and the IP Assets with them.

20. Alternatively, this Court could find that the pre-petition actions by Winners constituted a oral assignment of the IP Assets to Debtor:

> Even if a writing is lacking, an assignment may be proven in other ways. "If there is no documentary evidence of an assignment, it may be proven by the clear and uncontradicted oral testimony of a person in a position to have actual knowledge." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:4 (4th ed. 2005). However, courts must be cautious in scenarios that do not involve clear written documents of assignment. "Requiring strong evidence to establish an assignment is appropriate both to prevent parties from using self-serving testimony to gain ownership of trademarks and to give parties incentive to identify

- 10 -

expressly the ownership of the marks they employ." TMT North America, Inc. v. Magic Touch GmbH, 124 F.3d 876, 884 (7th Cir. 1997).

*Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 822 (3d Cir. 2006).

21. The evidence will establish that in leaving Debtor operating (which affiliates had an incentive to do, for the affiliated companies had guaranteed a great many of the leases), the affiliates controlling or under common control with Winners gained an advantage. But there are consequences to this--leaving Debtor to its own devices, to continue to incur claims it could not pay and harming creditors, is part and parcel of a wholesale assignment of all rights, including any rights in the IP Assets.

### d. Waiver of Stays

22. Bankruptcy Rule 6004(h) provides, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) stays any order authorizing the assignment of an executory contract or unexpired lease for 14 days, unless the court orders otherwise. Fed. R. Bankr. P. 6006(d). Debtor submits that, to the extent the Winning Bidder requires it, cause exists for the Court to exercise its discretion and abrogate the 14 day stays provided for by Bankruptcy Rules 6004(h) and 6006(h).

**WHEREFORE**, Movant respectfully requests that the Court enter an Order approving the sale of these assets, and granting such other and further relief which is fair and equitable under the Bankruptcy Code.

Dated:  July 5, 2011.	Respectfully submitted,

**JOHN J. MCMANUS & ASSOCIATES, P.C.**

/s/
John J. McManus
Georgia Bar No. 497776
Christian Turner
Georgia Bar No. 142611
2167 Northlake Parkway, Suite 104
Tucker, Georgia  30084
Tel:    770-492-1000
Fax:    770-492-1100
Email: jmcmanus@mcmanus-law.com
           cturner@mcmanus-law.com

*Counsel to Debtor*

## EXHIBIT A - AUCTION PROCEDURES

Famous Recipe Company Operations, LLC, d/b/a Mrs. Winner's Chicken & Biscuits, debtor and debtor-in-possession herein ("***Debtor***") will be filing a motion seeking entry of an order approving (i) assumption and assignment of certain executory contracts and unexpired leases and (ii) the sale of substantially all of Debtor's assets clear of all liens, claims, encumbrances, and interests (the "***Sale Motion***").

**Notice is further given that** under the Sale Motion, Debtor will conduct an auction for the sale of Debtor's thirteen "Mrs. Winner's" brand quick-service chicken restaurants, including the equipment, inventory, other personal property, store leases, and contract rights associated with those stores, and the "Mrs. Winner's" brands, trademarks, and related intellectual property (collectively the "***Assets***").

**Notice is further given that** if Debtor timely receives one or more bids from Qualified Bidders (as defined below), Debtor shall conduct an auction on **July 12, 2011** beginning at 10:00 a.m. at the offices of Hunton & Williams LLP, 600 Peachtree Street, Suite 4100, Atlanta, Georgia 30308 (the "***Auction***").

**Notice is further given that** a Qualified Bidder is a person who submits a bid to acquire the Assets that strictly conforms to the bidding procedures contained below. Any person submitting a bid which fails to meet the requirements below shall not be a Qualified Bidder and will not be permitted to participate at the Auction.

a) **Access to Information**. Information relevant to the Assets shall be made available to potential bidders within twenty-four (24) hours following the execution by potential bidders of a valid confidentiality agreement acceptable to Debtor. Such information includes certain books and records, material contracts, and other financial information for due diligence investigation. To obtain a copy of a confidentiality agreement, contact Debtor's investment banker, Arlington Capital Advisors, LLC ("*Arlington*") The John Hand Building, Suite 1100, 2000 Morris Avenue, Birmingham, Alabama 35203, 205-488-4380, Attn: Vann Russell, vrussell@arlingtoncapitaladvisors.com.

b) **Bid Deadlines**. Debtor will consider only formal, binding, unconditional, and irrevocable bids (each, a "*Bid*"). All Bids must be submitted via electronic mail or such other means so that they are actually received no later than noon local Atlanta, Georgia time on **July 11, 2011** (the "*Bid Deadline*"). Each bidder must deliver its Bid by the Bid Deadline to (i) Arlington Capital, The John Hand Building, Suite 1100, 2000 Morris Avenue, Birmingham, Alabama 35203, Attn: Vann Russell, vrussell@arlingtoncapitaladvisors.com; (ii) Counsel to FRCO, John J. McManus & Associates, 2167 Northlake Parkway, Suite 104, Tucker, Georgia 30084, Attn: John McManus, jmcmanus@mcmanus-law.com; and (iii) Counsel to FRCO's Creditors' Committee, Hunton & Williams LLP, 600 Peachtree Street, Suite 4100, Atlanta, Georgia 30308, Attn: Mark Duedall, mduedall@hunton.com.

c) **Types of Bids**. Bids must contain:

(i) an executed, irrevocable version of the applicable transactional documents necessary to complete the transaction proposed by the Bid;

(ii) if applicable, a marked or blacklined version of such transactional documents showing any changes to the form asset purchase agreement provided by Arlington;

(iii) a letter setting forth the identity of the bidder (including an authorized representative thereof), such bidder's counsel, and contact information for such bidder, its authorized representative, and its counsel;

(iv) a certified or bank check or wire transfer in an amount equal to 10% of the Bid as a minimum good faith deposit (the "*Minimum Deposit*").  The Minimum Deposit shall be held in escrow by Debtor's counsel and shall be used to fund a portion of the purchase price if the bidder ultimately closes on the transaction.  The Minimum Deposit of all bidders other than the Winning Bidder and the Back-Up Bidder, as defined below, will be returned within 72 hours of the conclusion of the Auction.  The Minimum Deposit of the Back-Up Bidder will be returned within 24 hours of the closing of the Auction with the Winning Bidder;

(v) written evidence of the bidder's financial ability to pay cash to consummate the transaction in a form satisfactory to Debtor and the Committee;

(vi) written acknowledgement that such Bid is unconditional and not contingent upon any event, including, without limitation, any due diligence investigation, the receipt of financing, or any further bidding approval;

(vii) written evidence that the bidder has the requisite corporate or similar authority to consummate the transaction; and

(viii) such other information as Debtor may reasonably request (provided, Debtor must supply as much notice as possible of any additional information required to accompany a Bid).

Bids that comply with the forgoing shall be "*Qualified Bids*." Persons that comply with the foregoing shall be "*Qualified Bidders*." The Stalking Horse Bidder, if any, shall be a Qualified Bidder. Qualified Bidders shall comply with all reasonable requests for additional information by Debtor or the Committee regarding the Bids and the foregoing information. Failure by a Qualified Bidder to comply with requests for additional information may be a basis for Debtor and the Committee to determine that a Bid is not a Qualified Bid.

**Notice is further given that** the Auction will proceed in accordance with the terms contained below. If only one Qualified Bid is submitted by the Bid Deadline, Debtor, upon consultation with the Committee, may decide to cancel the Auction, select such Qualified Bidder as the Winning Bidder, and present such offer to the Court for approval.

If two or more timely Qualified Bids are received by the Bid Deadline, Debtor will conduct the Auction. If an Auction is conducted, only parties who have submitted a Qualified Bid will be eligible to participate.

Debtor will select, after consulting with the Committee, the highest and best Qualified Bid (the "*Best Bid*"). Then the bidding at the auction will start at the Best Bid, plus $50,000.

At the Auction, the Qualified Bidders will bid in amounts greater than the then-highest bid by at least $50,000. Each Qualified Bidder will be permitted a fair, but limited, amount of time (no more than 15 minutes, unless otherwise agreed by Debtor and the Committee) to respond to the previous bid at the Auction.

Once Debtor fail to receive any other overbids, Debtor shall determine the "highest and/or best" Qualified Bid (the "*Winning Bid*" and the bidder making such Qualified Bid, the "*Winning Bidder*") and the next "highest and/or best" Qualified Bid (the "*Back-Up Bid*" and the bidder making such Qualified Bid, the "*Back-Up Bidder*"), and the purchase price shall be identified. Within one (1) day of the conclusion of the Auction, the Winning Bidder and the Back-Up Bidder must supplement their deposits so that they are equal to 10% of their final Bids. Within one (1) day of the conclusion of the Auction, Debtor shall file with the Court the final executed asset purchase agreements or other applicable transactional documents of the Winning Bidder and the Back-Up Bidder and a written statement indicating the final bids.

Debtor will present the Winning Bid and the Back-Up Bid to the Bankruptcy Court at the Hearing, as defined below, at which certain findings will be sought from the Bankruptcy Court regarding the sale process, including, among other things, that (i) the process leading to the selection of the Winning Bid and the Back-Up Bid was conducted and the Winning Bidder and the Back-Up Bidder for the Loans were selected in accordance with these Bidding and Auction Procedures, (ii) the sale process was fair in substance and procedure, (iii) the Winning Bidder and the Back-Up Bidder are entitled to the protections of 11 U.S.C. § 363(m); and (iv) consummation of the sale contemplated by the Winning Bid, or if necessary the Back-Up Bid, will provide the highest or otherwise best value for the Assets and is in the best interests of Debtor and its estate.

**Notice is further given that** a hearing on approval of the sale to the Winning Bidder and the Back-Up Bidder shall be held in this Court as soon after the Auction as possible (the "*Hearing*").

**Notice is further given that** the sale of the Assets by Debtor will be free and clear of all liens, claims, encumbrances and interests.

**Notice is further given that** Debtor retain the right, upon notice to all parties that have demonstrated an interest in bidding, and after consultation with the Committee, to jointly: (i) waive terms and conditions set forth herein with respect to any or all potential bidders; (ii) impose additional terms and conditions with respect to any or all potential bidders; (iii) extend the deadlines set forth herein; (iv) cancel the sale without further

notice; and (v) amend these Bidding and Auction Procedures as they may determine to be in the best interests of the estate or to withdraw the Sale Motion at any time with or without prejudice.  Debtor shall file any such changes or amendments with the Court, and provide to all known interested bidders, a written explanation of such changes as soon as reasonably practicable after such changes are made.